MORGAN, LEWIS & BOCKIUS LLP
Catherine N. Hounfodji, AZ State Bar No. 027389
catherine.hounfodji@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Phone: 713.890.5000

Jason R. Scherr (*pro hac vice*)
Bryan M. Killian (*pro hac vice*)
jr.scherr@morganlewis.com
bryan.killian@morganlewis.com
1111 Pennsylvania Ave NW
Washington, D.C. 20004
Phone: 202.309.6000
Attorneys for Defendant
SLS Federal Services, LLC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Tohono O'odham Nation,<br>Plaintiff,<br>v.<br>SLS Federal Services, LLC,<br>Defendant. | Case No. 4:26-cv-00574-SHR<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br>*(Hon. Scott H. Rash)* |

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ........ 1

II. BACKGROUND ........ 2

- 1. Relevant Facts ........ 2
  - a. The Roosevelt Reservation and the Nation's Reservation ........ 2
  - b. The Federal Government's Authority to Secure the Border ........ 3
  - c. CBP's Contract with SLS ........ 5
- 2. Relevant Procedural History ........ 6
  - a. The Nation's Pending Action in D.C. District Court ........ 6
  - b. The Nation's Follow-On Action in District of Arizona ........ 8

III. LEGAL STANDARD ........ 8

IV. ARGUMENT ........ 9

- 1. Interests in border security and expeditious construction of border infrastructure compel denial of the Nation's request. ........ 9
- 2. The Nation's purported harms are speculative and unsupportable. ........ 11
  - i. The Nation's claimed environmental injury is speculative. ........ 12
  - ii. Federal activities do not compromise the Nation's sovereignty. ........ 14
  - iii. The Nation's claimed harm to property rights are overstated. ........ 15
- 3. The Nation is not likely to succeed on the merits. ........ 18
  - a. SLS's conduct is protected by derivative sovereign immunity. ........ 18

i. The federal government acted within its constitutional authority.................................................18

ii. The federal government has authorized SLS's conduct. .........................................................................21

b. The federal government is a necessary and indispensable party that cannot be joined.....................................................24

i. The federal government is a necessary party. ................24

ii. It is not feasible to join the federal government............25

iii. The case may not proceed without the federal government.................................................................26

V. CONCLUSION ..................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. U.S.*,
567 U.S. 387 (2012) ........ 5

*Armored Grp. LLC v. Lutzker*,
No. CV-24-01516-PHX-SPL, 2025 WL 522523 (D. Ariz. Feb. 18, 2025) ........ 17

*Benisek v. Lamone*,
585 U.S. 155 (2018) ........ 16

*Bennett v. Isagenix Int'l LLC*,
118 F.4th 1120 (9th Cir. 2024) ........ 16

*Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*,
492 U.S. 408 (1989) ........ 16

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ........ 11, 14

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........ 26

*Chemehuevi Indian Tribe v. McMahon*,
No. CV 15-1538, 2016 WL 4424970 (C.D. Cal. Aug. 16, 2016) ........ 15

*Connecticut v. Massachusetts*,
282 U.S. 660 (1931) ........ 11

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
276 F.3d 1150 (9th Cir. 2002) ........ 25, 27

*Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*,
375 F.3d 861 (9th Cir. 2004) ........ 25

*Geo Grp., Inc. v. Menocal*,
607 U.S. 438 (2026) ........ 18

*H. Landau & Co. v. United States*,
886 F.2d 322 (Fed. Cir. 1989), *as amended on reh'g* (Dec. 11, 1989) .......... 23

*Haig v. Agee*,
453 U.S. 280 (1981) .......... 11

*Lackey v. Stinnie*,
604 U.S. 192 (2025) .......... 18

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) .......... 26

*Leslie Miller, Inc. v. State of Ark.*,
352 U.S. 187 (1956) .......... 23

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
643 F.2d 1197 (9th Cir. 1980) .......... 11

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) .......... 15

*Mullin v. Friends of the Ruidosa Church*,
610 U.S. ___ (2026) (per curiam) .......... 4, 10, 12

*N. Arapaho Tribe v. LaCounte*,
215 F. Supp. 3d 987 (D. Mont. 2016) .......... 15

*Nat'l Treasury Employees v. Von Raab*,
489 U.S. 656 (1989) .......... 10

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025) .......... 18, 21, 22

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
810 F.3d 631 (9th Cir. 2015) .......... 13

*Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993 (9th Cir. 2011) .......... 26, 27

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150 (9th Cir. 2011) .......... 16

*Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176 (9th Cir. 2012) .......... 24

*Sampson v. Murray*, 415 U.S. 61 (1974) .......... 17

*Swinomish Indian Tribal Cmty. v. BNSF Railway Co.*, 951 F.3d 1142 (9th Cir. 2020) .......... 15

*Tohono O'Odham Nation v. Mullin, et al.*, No. 26-5306 (D.C. Cir.) .......... 7, 8

*Tohono O'Odham Nation v. Mullin, et al.*, No. 26-cv-2127 (D.D.C.) .......... *passim*

*U.S. v. Brignoni-Ponce*, 422 U.S. 873 (1975) .......... 10

*U.S. v. Mitchell*, 463 U.S. 206 (1983) .......... 17

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......... *passim*

*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940) .......... 22

**Statutes**

6 U.S.C § 202 .......... 3

25 U.S.C. 398d .......... 19

28 U.S.C. § 1505 .......... 17

Consolidated Appropriations Act, 2008 .......... 4, 19

IIRIRA § 102(a) ........ *passim*
IIRIRA § 102(b) ........ 4, 15
IIRIRA § 102(c) ........ 4, 10
Omnibus Consolidated Appropriations Act, 1997 ........ 4, 19, 23
One Big Beautiful Bill Act ........ 5, 19
Pub. L. No. 75-217, 50 Stat. 536, 536 (1937) ........ 3
Pub. L. No. 79-709, 46 Stat. 1202, 1202 (1931) ........ 3
Secure Fence Act ........ 3

**Other Authorities**

90 Fed. Reg. at 8468 ........ 4
*Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*, 91 Fed. Reg. 45823–24 (July 21, 2026) ........ 5, 14
Fed. R. Civ. Proc. 19 ........ 24
H.R. Rep. 109-72 ........ 4

## I. PRELIMINARY STATEMENT

U.S. Customs and Border Protection ("CBP"), an agency of the Department of Homeland Security, engaged SLS Federal Services, LLC ("SLS") to build a border wall along 62 miles of the international border with Mexico in Arizona. The Tohono O'odham Nation (the "Nation") sought an injunction from those agencies and U.S. Border Patrol in the United States District Court for the District of Columbia ("D.C. District Court") to stop construction from proceeding. The merits of the Nation's claims and request for extraordinary relief were promptly rejected, after which the Nation came to this Court to sue SLS directly on the same facts.

Because the Nation's action in this forum concerns the same planned construction, directed by the same federal agencies, on the same land, with the same alleged harm, the result in this forum should be the same: the Nation has not made a clear showing that it is entitled to preliminary relief, so its request should be denied.

*First*, the compelling interest in border security, including in the expeditious construction of physical barriers along the international border, plainly outweighs the Nation's speculative and unsupportable claimed harms. Just two weeks ago, the Supreme Court acknowledged this compelling federal interest when overturning an injunction that had paused construction of a wall along the same international border. The federal interest in controlling border security independently prevents granting injunctive relief here.

*Second*, none of the three categories of harm alleged by the Nation satisfies the Nation's burden to demonstrate immediate threatened injury, especially in light of the overwhelming interest in national security. The Nation's claimed environmental injury is speculative and the Nation's sovereignty and property rights are not compromised by federal activities.

*Third*, the Nation cannot demonstrate a likelihood of success on the merits. SLS is afforded the protection of derivative sovereign immunity because the government has acted within its constitutional authority and has authorized the very

conduct that the Nation challenges. The Nation's claim also fails because the federal government is a necessary and indispensable party in this action that has not been joined—and cannot be joined. Participation of the federal government is necessary to afford complete relief to the parties and to protect the government's interests and avoid subjecting SLS to inconsistent obligations.

Following three prior attempts to enjoin or stay this same construction, the Nation is taking a fourth bite at the apple. But no matter how many times it tries, the Nation cannot elevate its private interest in opposing federal policies over the superior federal authority to secure the border as it deems necessary—including the explicit congressional authorization to "waive all legal requirements" as "necessary to ensure expeditious construction." Because the Nation cannot clearly establish entitlement to the extraordinary relief it seeks here, its motion should be denied.

## II. BACKGROUND

### 1. Relevant Facts

#### a. The Roosevelt Reservation and the Nation's Reservation

In 1907, President Roosevelt issued a Proclamation reserving a sixty-foot strip of public land along the Mexico border from California through the Territories of Arizona and New Mexico, "from the operation of the public land laws and kept free from obstruction as a protection against the smuggling of goods" between the United States and Mexico. Dkt. No. 18-3, *Tohono O'Odham Nation v. Mullin, et al.*, No. 26-cv-2127 (D.D.C. July 7, 2026) (1907 Proclamation, 35 Stat. at 2136). The strip is known as the "Roosevelt Reservation." *Id.*, Dkt. No. 45, at 11 (D.D.C. Aug. 14, 2026) ("Mem. Op."). The Proclamation excluded from the Roosevelt Reservation all lands that were "embraced in any legal entry or covered by any lawful filing, . . . or upon which any valid settlement has been made pursuant to law." *Id.*

The Nation's reservation ("Reservation") was established by executive order in 1917. Exec. Order 2524, *Reserving Certain Lands in the State of Arizona for the [Nation]* (Feb. 1, 1917). That order preserved "any existing legal right of any person



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
HOUSTON

to any of the lands" in the defined area. *Id.* In 1931, Congress recognized and expanded the Reservation. Pub. L. No. 79-709, 46 Stat. 1202, 1202 (1931). In 1937, Congress further expanded the Reservation but provided that the "extension shall not affect any valid rights initiated prior to the approval hereof nor the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907 (35 Stat. 3136)"—that is, the Roosevelt Reservation. Dkt. No. 18-4, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. June 16, 2026) (Pub. L. No. 75-217, 50 Stat. 536, 536 (1937)). The 1937 Act also stated that the lands added then would become part of the Reservation "in all respects and upon all the same terms as if said lands had been included in the Executive order issued by the President on February 1, 1917." *Id.*

The Nation acknowledged the existence of the Roosevelt Reservation in 2004, when it discussed U.S. Border Patrol's "plans to construct the border vehicle barrier and road entirely within the sixty-foot strip of land reserved by the Presidential Proclamation of President Theodore Roosevelt dated May 27, 1907." *Id.*, Dkt. No. 18-6 (D.D.C. July 7, 2026) (Tohono O'odham Nation Resolution No. 04-095 (Mar. 5, 2004)). The Nation has long collaborated with federal agencies on border security measures, including the construction of 52 miles of vehicle barriers. *See* Dkt. No. 8 at 4–5; Dkt. No. 1 ¶¶ 18–20; *see also* Dkt. No. 18-6, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. July 7, 2026); *id.*, Dkt. No. 18-2 ¶ 10 (D.D.C. July 7, 2026).

b. <u>The Federal Government's Authority to Secure the Border</u>

The Secretary of the Department of Homeland Security (the "Secretary") is responsible for "tak[ing] all actions . . . necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(a), 120 Stat. 2638, 2638 (codified at 8 U.S.C. § 1701 note); *see* 6 U.S.C § 202(1), (2) ("The Secretary shall be responsible for . . . [s]ecuring the borders . . . of the United States."). To prevent unlawful entries into the United States, *see* Secure Fence Act

§ 2(b), the President has directed the Secretary to "take all appropriate action to deploy and construct temporary and permanent physical barriers" on the southern border of the United States. Exec. Order 14165, § 3, 90 Fed. Reg. at 8468.

Section 102(a) of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) directs the Secretary to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 102(a), 110 Stat. 3009, 3009-554 (1996) (codified at 8 U.S.C § 1103 note). In the most recent amendment to IIRIRA, Congress required the Secretary to "construct reinforced fencing along not less than 700 miles of the southwest border," where the fencing "would be most practical and effective" to "achieve and maintain operational control over the international border." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, § 564(2), 121 Stat. 1844.

IIRIRA requires the Secretary to "consult" with certain groups, including "Indian tribes," to "minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents" near potential fencing. IIRIRA § 102(b)(1)(C)(i). But that consultation obligation neither creates a right of action nor affects the eminent domain laws of the United States. *Id.* § 102(b)(C)(ii)(I), (II).

To support expeditious border construction, IIRIRA grants the Secretary sole discretion to waive the requirements not only of environmental protection and other conservation laws, but "all legal requirements" as may be necessary "to install additional physical barriers" along the southern border. *See Mullin v. Friends of the Ruidosa Church*, 610 U.S. ___, at 4 (2026) (per curiam); *see* IIRIRA § 102(a), (c)(1); H.R. Rep. 109-72, at 171 (clarifying congressional intent waiver authority "extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure"). Pursuant to that

authority, the Secretary waived legal requirements in certain statutes in relation to the construction of barriers and roads in the area at issue in this action, which the Secretary identified as "an area of high illegal entry." *Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*, 91 Fed. Reg. 45823–24 (July 21, 2026).

CBP is an agency within DHS that "play[s] a major role in enforcing the country's immigration laws," including by "determining the admissibility of aliens and securing the country's borders." *Arizona v. U.S.*, 567 U.S. 387, 397 (2012). In 2025, Congress appropriated $46.5 billion to CBP for the construction of border infrastructure and a wall, including primary and secondary barriers, access roads, and detection technology. One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72, 357-58 (2025).

c. <u>CBP's Contract with SLS</u>

On May 15, 2026, CBP released for solicitation contract number 70B01C26D0000003 seeking bids for construction of a primary and secondary border wall and associated infrastructure along the 62-mile length of the Nation's southern border. Dkt. No. 1 ¶ 5, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. June 16, 2026); *id.*, Dkt. No. 39-2, Ex. 2 (D.D.C. July 30, 2026). Pursuant to the "Statement of Work," CBP "manages the planning, design, and construction of Border Patrol's border enforcement zones[;]" it sought a contractor to design and construct a wall and related infrastructure in Pima County, Arizona; CBP set forth the requirements, specifications, and timeline for the project; and it maintains sole authority to alter the contract. *Id.*, Dkt. No. 39-2, Ex. 2 ¶¶ 2–5, 14 (D.D.C. July 30, 2026).

Pursuant to the contract, construction of the wall and related infrastructure is within the Roosevelt Reservation. *Id.*, Dkt. No. 18-2 ¶¶ 13, 21–22 (D.D.C. July 7, 2026). If temporary staging areas must be placed outside of the Roosevelt Reservation, SLS must use "previously-disturbed areas" for those areas and then return existing roads and the areas to "pre-construction conditions," as with all

border barrier projects. *Id.* ¶¶ 20, 22. CBP explained that "[i]f CBP were required to use areas north of the [Roosevelt Reservation] for temporary staging areas, CBP expects these areas will also be in the immediate vicinity of the international border," and impacts will be temporary because "CBP will take appropriate steps to restore these areas following demobilization of the project equipment." *Id.* ¶ 20; *accord*, IIRIRA § 102(a) (directing the Secretary to "take such actions as may be necessary . . . ***in the vicinity*** of the United States border") (emphasis added).

CBP issued the contract to SLS on June 26, 2026. Dkt. No. 1 ¶ 26; *see* Dkt. No. 39-2, Ex. 2, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. July 30, 2026). SLS is engaged in pre-construction testing and surveying in the Roosevelt Reservation, with which the Nation agreed "not to interfere." Dkt. No. 1 ¶¶ 29–30 (discussing SLS's taking of geotechnical borings and geotagging). The Nation communicates directly with CBP and other federal officials about the scheduling and scope of this pre-construction activity, and CBP has accompanied SLS through the Reservation to conduct the testing and surveying in the Roosevelt Reservation. *See id.* ¶¶ 29–31; Dkt. No. 41-1, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 6, 2026). As indicated by the ongoing testing and surveying, the design of the border wall and related infrastructure remains in progress.

**2. Relevant Procedural History**

a. <u>The Nation's Pending Action in D.C. District Court</u>

On June 16, 2026, the Nation filed suit in the D.C. District Court against Markwayne Mullin, Rodney Scott, and Rosario Vasquez in their official capacities as the Secretary of DHS, Commissioner of CBP, and Chief of U.S. Border Patrol, respectively. Dkt. No. 1, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. June 16, 2026). The Nation seeks to enjoin the officials from "directing the construction" of a wall along the Nation's southern border where Arizona meets Mexico and brought an *ultra vires* claim based on alleged divestment of its land without Congressional authorization with, as particularly relevant here, a federal common

law trespass claim. *Id.* ¶¶ 1, 58–63. The factual basis for the Nation's claims in D.C. District Court is the contract solicited by CBP for the construction of the primary and secondary border wall and ancillary infrastructure. *Id.* ¶¶ 49–50.

The Nation moved for a preliminary injunction the next day, arguing that the use of "heavy equipment and dynamite" by ***the Secretary's "designated contractors"*** would undermine the Nation's sovereignty, violate its property rights, cause permanent environmental injury, and interfere with its religious exercise. *Id.*, Dkt. No. 3-1 at 18, 41–43 (D.D.C. June 17, 2026) (emphasis added). The Nation's proposed order sought to enjoin the officials "and their employees, subordinates, and agents" from "taking, or authorizing or directing any other person to take, any steps in furtherance of construction of the planned border wall or associated infrastructure on the Nation's Reservation[.]" *Id.*, Dkt. No. 3-16 (D.D.C. June 17, 2026).

The district court denied the Nation's motion for a preliminary injunction on August 14, 2026. *Id.*, Mem. Op. (D.D.C. Aug. 14, 2026). The Court concluded that the Nation was unlikely to succeed on the merits because its "novel *ultra vires* theory fails to meet the 'high bar'" for injunctive relief and because sovereign immunity bars its trespass claim. *Id.* at 10–16.

The Nation has appealed. *Id.*, Dkt. No. 48 (D.D.C. Aug. 26, 2026); *see Tohono O'Odham Nation v. Mullin*, *et al.*, No. 26-5306 (D.C. Cir. Aug. 27, 2026). Pending appeal, the Nation sought a second injunction to halt construction activities, which the D.C. District Court denied on October 8, 2026. Dkt. No. 63, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. Oct. 8, 2026). The Nation moved for another injunction pending appeal, this time from the United States Court of Appeals for the District of Columbia Circuit. Dkt. No. 2196333, *Tohono O'Odham Nation*, No. 26-5306 (D.C. Cir. Oct. 5, 2026). That motion remains pending.

One of the Nation's primary arguments on appeal is that the officials are not entitled to immunity from suit for trespass for the reason that their actions allegedly exceed their legal authority. *Id.*, Dkt. No. 2193480, at 23–25 (D.C. Cir. Sept. 16,

2026). The D.C. Circuit will hear oral argument on December 1, 2026. *Id.*, Dkt. No. 2199281 (D.C. Cir. Oct. 20, 2026).

b. The Nation's Follow-On Action in District of Arizona

On October 28, 2026, the day briefing concluded in the D.C. Circuit, the Nation filed this action and sought, for the fourth time, an injunction—this time against SLS. Dkt. No. 1 at 12 ¶ B; Dkt. No. 8.

As in its suit in the D.C. District Court, the Nation alleges a federal common law trespass claim and seeks to enjoin SLS from conducting any activity "in furtherance of construction of a border wall or associated infrastructure" along the nearby border with Mexico. Dkt. No. 1 ¶¶ 41–45; *id.* at 12 ¶ B. The Nation again states that the planned construction activity will harm mountain ranges and Saguaro cacti, the Nation's sovereign right to control its territory, and its property rights. *Id.* ¶¶ 33–38. Many of the Nation's allegations in this action and in its complaint filed in the D.C. District Court are materially the same. *Compare* Dkt. No. 1 ¶¶ 13–16, 18–19, 28, 34, *with* Dkt. No. 1 ¶¶ 13–14, 19, 24, 34, 38–39, 51, 55, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. June 16, 2026). And many allegations refer to the Nation's past and ongoing collaboration with CBP on border security measures and its recent correspondence and interactions with CBP related to activity "associated with" the contract to construct the wall. Dkt. No. 1 ¶¶ 3, 18–20, 24–25, 29–31.

As with its prior action, the Nation again moved here for a preliminary injunction within days of filing. Dkt. No. 8. SLS moved to transfer the action to the D.C. District Court on November 13, 2026. Dkt. No. 11.

## III. LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that

he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *see* Mem. Op. at 5–6, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026).

## IV. ARGUMENT

The Court should deny the Nation's request for a preliminary injunction because the Nation has not made a clear showing that it is entitled to the extraordinary relief sought.

### 1. Interests in border security and expeditious construction of border infrastructure compel denial of the Nation's request.

To determine whether to employ the "extraordinary remedy of injunction," courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with particular regard for the "public consequences." *Winter*, 555 U.S. at 24 (citation omitted). The Nation asks this Court to disregard substantial and serious public consequences at the core of its motion by seeking to stop construction of a wall that the federal government has determined should be built along the international border. *See* Dkt. No. 8 at 1–2, 10; Dkt. No. 8-10. Its request should be denied because it directly contradicts recent Supreme Court authority, the public's long-held interest in the safety and integrity of the borders, and explicit congressional authorization to expeditiously construct physical barriers on the international border under the direction of the Department of Homeland Security.[1]

Just two weeks ago, the Supreme Court issued an 8-1 decision overturning an

---

[1] Because the conduct the Nation seeks to enjoin is fundamentally that of a federal agency, *see* Dkt. Nos. 8, 8-1 (requesting injunction of activities in furtherance of construction of border wall, pursuant to CBP contract), the balance of the equities and public interest factors in the preliminary injunction analysis merge. *Cf.* Mem. Op. at 17, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

injunction that paused construction of a different section of the wall along the international border with Mexico, exactly like the injunction the Nation seeks from this Court. *See Mullin v. Friends of the Ruidosa Church*, 610 U.S. ___ (2026) (per curiam). Just like in this action, the Secretary determined that the "Big Bend Sector" of the border at issue in *Mullin* is an "area of high illegal entry requiring additional border barriers," and he "waived environmental and conservation laws to facilitate expeditious construction." *Id.* at 1; *see supra* Section II.1(b).

The United States District Court for the Western District of Texas entered a preliminary injunction halting construction, from which the Solicitor sought summary reversal or a stay. *Id.* at 2. In granting a stay, the Supreme Court concluded that an injunction delaying construction of border barriers and roads—just as the Nation urges this Court to enter—"impedes the Government from advancing its 'compelling interests' in border security and integrity." *Id.* (quoting *Nat'l Treasury Employees v. Von Raab*, 489 U.S. 656, 672 (1989)). Those compelling national interests outweigh the claimed "aesthetical, recreational, and environmental harm," especially given Congress's "clear preference for expeditious border construction over the very harms respondents assert[ed]" in enacting IIRIRA § 102(c) and permitting the Secretary to waive applicable legal requirements. *Id.* at 4.

By strongly affirming the "compelling interests" to border security advanced by CBP's construction of border walls, the Supreme Court demonstrates how heavily those interests weigh in this Court's analysis, especially where comparison to the Nation's competing and speculative claimed harms is not "a close question." *Winter*, 555 U.S. at 26 (concluding weight of public interest in military exercises under realistic conditions "plainly outweigh[ed]" plaintiffs' interests). Those "compelling interests in safety and in the integrity of our borders" have long been recognized as significant, *Von Raab*, 489 U.S. at 672, particularly with regard to the international border with Mexico, *see U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) ("[T]he public interest demands effective measures to prevent the illegal entry of aliens at

the Mexican border.").

The public's robust interest in physical border walls also has been repeatedly and consistently affirmed by congressional appropriation of funds to construction of the wall and its enactment of IIRIRA. Mem. Op. at 18, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026). The import of these interests is expressed through the Secretary's broad authorization to identify areas of high need and risk, dedicate substantial federal resources to those areas, and waive applicable laws in favor of expeditious construction. *See supra* Section II.1(b). If granted, the Nation's request for extraordinary relief from this Court would directly impede the Secretary's authority to take action pursuant to Congress's clear directive and, thus, would compromise the security of the border. *See* Dkt. No. 18-1 ¶ 23, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. July 7, 2026) (explaining that if wall is not constructed, DHS "anticipates increases in illegal crossings by aliens which will require diversion of Border Patrol assets . . . from other critical national security and public safety threats").

The weight of the public's substantial and substantiated interest in a secure border and expeditious border construction, as explicitly emphasized in *Mullin*, heavily favors denial of the Nation's request. *See also Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.") (citation omitted).

**2. The Nation's purported harms are speculative and unsupportable.**

The Nation has not established that it is likely to suffer irreparable harm absent preliminary relief. A preliminary injunction cannot be granted based on the "possibility" of irreparable harm, *Winter*, 555 U.S. at 22, or on harm for which there is an adequate remedy at law, *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 643 F.2d 1197, 1202 (9th Cir. 1980); *see Conn. v. Mass.*, 282 U.S. 660, 674 (1931) ("[An injunction] will not be granted against something merely feared as liable to occur at some indefinite time in the future."). Instead, a party must

"demonstrate immediate threatened injury." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

The Nation sets forth three categories of purported irreparable harm: (1) environmental injury; (2) abrogation of its "sovereignty and self-determination"; and (3) undermining of its property rights. Dkt. No. 8 at 23–24. None of those harms satisfies the Nation's burden to demonstrate immediate threatened injury, and all are nonetheless outweighed by the "compelling interests in border security and integrity" and "expeditious border construction" emphasized by the Supreme Court just earlier this month. *Mullin*, 610 U.S. at 3–4.

i. <u>The Nation's claimed environmental injury is speculative.</u>

First, the Nation asserts that environmental injury will occur because it believes SLS "will detonate mountaintops, uproot saguaros, and bulldoze extremely sensitive vegetation and landscapes while leaving behind permanent structures and roads." Dkt. No. 8 at 23. When the Nation presented similar claimed environmental injuries, the District of D.C. rejected the alleged harm as speculative and emphasized the availability of mitigation efforts. Mem. Op. at 17, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026); *see id.*, Dkt. No. 3-1 at 42 (D.D.C. June 17, 2026) (claims that planned construction would "result in the flattening of mountaintops, the scarring of the Reservation landscape, and marked impacts on Reservation resources").

As an initial matter, the Nation's theory of environmental injury has no factual basis. The Nation says that its "lands" will be injured by construction of the border wall, Dkt. No. 8 at 23, but CBP has directed such construction within the 60-foot Roosevelt Reservation, Dkt. No. 18-2 ¶¶ 13, 22, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. July 7, 2026). That narrow strip along the Nation's southern border is public land reserved by the federal government. *See supra* Section II.1(a); *see also* Mem. Op. at 11–13, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026) (discussing history of the Roosevelt Reservation and holding that it "likely

exists along the international border"). And the Nation's claimed environmental injuries from construction within the Roosevelt Reservation are disconnected from its sole trespass claim based on use of "interior Reservation roads," Dkt. No. 1 ¶ 43, so this Court lacks authority to grant the Nation the relief it seeks, *see Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (holding that "there must be a relationship between the injury claimed in the motion for injunctive relief and the claims set forth in the underlying complaint itself"). The Nation has thus failed to show that, as a matter of fact, any alleged environmental injury on land to which it holds a valid title is imminent.

The Nation's claimed environmental injury is also speculative. CBP and SLS continue to develop the plan for the construction of the border wall, and the Nation does not provide evidence of a specific and concrete action approved by CBP that will cause any environmental injury. Instead, it cautions that "[i]f a relocation project" of plants and animals "is not undertaken thoughtfully and meticulously planned," there is a "grave risk" that construction activities could create harms. Dkt. 8-8 ¶ 15 (cited Dkt. No. 8 at 23). The Nation provides no evidence that the construction and relocation activities will not be "undertaken thoughtfully and meticulously planned," *id.*, and CBP employs a wide variety of mitigation efforts and best practices to account for the impacts of construction on vegetation, mountainous terrain, and culturally significant resources, *see* Dkt. No. 18-2 ¶¶ 21–24, 26–29, 32, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. July 7, 2026).

The Nation's fears that permanent structures and roads will cause irreparable injury are also factually unsupportable and speculative. Any new roads constructed would be confined to the Roosevelt Reservation and would continue to be used as part of the east-west patrol road accompanying the barrier system. Dkt. No. 18-2 ¶ 21, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. July 7, 2026). To the extent temporary staging areas are required outside of the Roosevelt Reservation, SLS is required to return those areas to "pre-construction conditions," as is "routine for CBP

border barrier projects." *Id.* ¶ 22. The Nation may believe those requirements to be "fanciful," Dkt. No. 8 at 20, but it does not move beyond the theoretical to connect any specific planned or ongoing activity to any of its claimed environmental injuries.

Ultimately, the Nation's broad contentions, which are based on speculation and disregarding the existence of the Roosevelt Reservation, are insufficient to warrant injunctive relief. *See Baldrige*, 844 F.2d at 675–76 (rejecting "[s]ubjective apprehensions and unsupported predictions" as sufficient to satisfy burden of demonstrating immediate threat of irreparable harm); *Winter*, 555 U.S. at 22 ("A preliminary injunction will not be issued based only on a possibility of some remote future injury.") (citation modified) (citation omitted); *see also* Mem. Op. at 16, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026) ("[S]ignificant uncertainties remain about the actual scope of construction activities and the extent to which they may interfere with the Nation's land outside the Roosevelt Reservation."). Even if they were not otherwise inadequate, *Mullin* confirms that the Nation's alleged environmental harms are necessarily outweighed by the public interest in securing the 62 miles of international border at issue. *See* 610 U.S. at 4 (concluding that Congress's "clear preference for expeditious border construction" and interests in border security outweigh environmental harm); *Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*, 91 Fed. Reg. 45823–24 (waiving legal requirements in light of "acute and immediate need to construct additional physical barriers and roads" on Nation's southern boundary).

ii. <u>Federal activities do not compromise the Nation's sovereignty.</u>

Second, the Nation claims that its "sovereignty and self-determination" will be abrogated by SLS's alleged ability to "enter and reshape the Nation's own homeland." Dkt. No. 8 at 23. The District of D.C. rejected this nearly identical claimed harm as "unlikely to materialize." Mem. Op. at 17, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026); *see id.*, Dkt. No. 3-1 at 42 (D.D.C. June 17, 2026) (asserting in request for injunction, as it does here, that "[i]t is

difficult to imagine a more complete abrogation of the Nation's sovereignty than for the federal government . . . over the Nation's vehement objections to reshape the Nation's own homeland").

The Nation's sovereignty does not get compromised—much less irreparably harmed—by federally superintended activities over which the Nation has no authority. The Nation's authority does not extend to control over federal activities in the Roosevelt Reservation, to which construction of the wall is confined, or otherwise override Congress's explicit direction to construct physical barriers and related infrastructure along the southwest border. *See* IIRIRA §§ 102(a), (b)(1)(A). And, pursuant to that authority, as the Nation acknowledges, federal agencies have long conducted border security activities along the Nation's southern border. *See* Dkt. No. 8 at 7–8; Dkt. No. 1 ¶¶ 19–20.

The authority on which the Nation relies for broad propositions about sovereignty and harm does not compel a different result. Dkt. No. 23–24. None of those cases involves a tribe's disapproval of conduct taken by a federal agency acting within the scope of its prescribed and superior authority. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137–38 (1982) (addressing tribe's "authority to tax non-Indians who conduct business on the reservation"); *Swinomish Indian Tribal Cmty. v. BNSF Railway Co.*, 951 F.3d 1142, 1160–61 (9th Cir. 2020) (holding that federal act did not abrogate treaties permitting tribe to exclude and condition presence on reservation lands); *N. Arapaho Tribe v. LaCounte*, 215 F. Supp. 3d 987, 999 (D. Mont. 2016) (concluding that federal defendants failed to comply with federal statute and likely breached duty of trust); *Chemehuevi Indian Tribe v. McMahon*, No. CV 15-1538, 2016 WL 4424970, at *6–7 (C.D. Cal. Aug. 16, 2016) (considering whether parcel of land was "Indian country" such that state could not enforce law regulating conduct there).

iii. <u>The Nation's claimed harm to property rights are overstated.</u>

Third, the Nation asserts that SLS's conduct will "undermine [its] property

rights," which it also ties to its sovereignty. Dkt. No. 8 at 24. That connection is just a truism—as an Indian tribe, the Nation's sovereignty is inherently tied to land. *See Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*, 492 U.S. 408, 457 (1989) ("[T]ribal sovereignty is in large part geographically determined.") (citation omitted). The D.C. District Court rejected the same claimed harm. Mem. Op. at 17, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026); *see id.*, Dkt. No. 3-1 at 42 (D.D.C. June 17, 2026) (alleging harm to the Nation's proprietary control over its lands and power to exclude).

Like its sovereignty, the Nation's property rights do not extend to the Roosevelt Reservation, which has been explicitly reserved by the United States for border security and which is the location of the planned border wall. *See supra* Section II.1(a). To the extent the Nation argues otherwise, construction of a wall along the Nation's southern border, on federal land, also will not change the boundaries of the Nation's reservation. Mem. Op. at 13, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026).

If the Nation grounds this claimed harm in possible activities that *may* occur outside of the Roosevelt Reservation at some point, the belief that those activities will result in dispossession of its property that rises to the level of irreparable harm is speculative. *Cf. Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (affirming finding that threat of eviction constituted irreparable injury). And if the Nation's purported harm to property is based on its allegations that, between August 10 and 12, 2026, "at least eleven vehicles associated with" SLS were stopped somewhere within the Reservation, Dkt. No. 1 ¶ 29, the Nation does not articulate how such alleged presence more than three months ago constitutes irreparable harm; neither does it address the impact of its subsequent consent to SLS's pre-construction activity on the harm analysis. *See id.*; *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (concluding that plaintiff delay in seeking preliminary injunction weighed against its entry); *Bennett v. Isagenix Int'l*

*LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024) (explaining that "self-inflicted" harm undermines claim for equitable relief). The Nation also leaves vague whether SLS's August travel occurred on the roads they characterize as "private" or on the public roads within the Reservation that are "generally open to public use." Dkt. No. 1 ¶¶ 23, 29. Regardless, the Nation does not explain how continued vehicular use of existing roads could comprise irreparable harm. *See Armored Grp. LLC v. Lutzker*, No. CV-24-01516-PHX-SPL, 2025 WL 522523, at *10 (D. Ariz. Feb. 18, 2025) (rejecting request for preliminary injunction because plaintiff did not establish "new harm or significantly worsening injury" from ongoing practice).

The Nation also fails to articulate why legal relief is inadequate to remedy any injuries resulting from construction activity within the Reservation, which is a base requirement for injunctive relief. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("'[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") (citation omitted). Insofar as its claims flow from a federal contract, the Nation does not explain what prevents it from seeking monetary damages from the United States for violations of federal law in the United States Court of Federal Claims, *see* 28 U.S.C. § 1505; *U.S. v. Mitchell*, 463 U.S. 206, 212 n.8, 216–18 (1983) (recognizing jurisdiction of Court of Federal Claims over tribe's claim against United States for monetary damages), the possibility of which "weighs heavily against a claim of irreparable harm," *Sampson*, 415 U.S. at 90.

Just as the District of D.C. concluded, none of the Nation's purported harms satisfies its burden to establish that irreparable harm is likely absent preliminary relief. Mem. Op. at 17, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026); *see Winter*, 555 U.S. at 22 (reiterating that injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). All, too, are outweighed by interests in "securing the border, enforcing immigration laws, and ensuring public safety." Mem. Op. at

17, *Tohono O'odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026); *see Mullin*, 610 U.S. at 3.

**3. The Nation is not likely to succeed on the merits.**

Finally, the Nation's request for a preliminary injunction should be denied because the Nation has not established that it is likely to succeed on the merits of its single federal common law trespass claim. *See Lackey v. Stinnie*, 604 U.S. 192, 198 (2025) ("[A] finding of *likely* success on the merits is a prerequisite to preliminary injunctive relief.") (discussing *Winter*, 555 U.S. at 20). That claim fails—and is therefore *likely* to fail—because, among other reasons, SLS's conduct is protected by derivative sovereign immunity and because the government is a necessary and indispensable party that cannot be joined.

a. <u>SLS's conduct is protected by derivative sovereign immunity.</u>

Derivative sovereign immunity "protects a private entity that has contracted with the federal government, provided that [i] the government acted within its constitutional authority and that [ii] the government has specifically authorized the contractor's actions at issue." *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 770 (9th Cir. 2025). Because the government acted within its constitutional authority and specifically authorized SLS's conduct, SLS is protected from any alleged liability under the derivative sovereign immunity defense, and the Nation's claim fails. Because derivative sovereign immunity is defense to liability rather than simply an extension of the government's own immunity, this defense is available to SLS regardless of the Court's ultimate determination of the government's immunity. *See Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 449–51 (2026).

i. <u>The federal government acted within its constitutional authority.</u>

The D.C. District Court has already held that the federal government's decision to construct a border wall along the Nation's southern border—*i.e.*, the international border with Mexico—is within the government's constitutional authority. Considering the same Congressional authority and the same contract at

issue here, the District of D.C. determined that the Nation is not likely to succeed on its claim that the government acted in excess of its delegated power or contrary to statute. *See* Mem. Op. at 10, *Tohono O'Odham Nation v. Mullin, et al.*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026).

Through legislation, Congress has authorized the construction of physical barriers at the United States-Mexico border. Section 102(a) of the IIRIRA mandates that the Secretary "***shall*** take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Omnibus Consolidated Appropriations Act § 102(a) (emphasis added). Congress has specifically instructed the Secretary to "construct reinforced fencing along not less than 700 miles of the southwest border," where the fencing "would be most practical and effective" to "achieve and maintain operational control over the international border." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, § 564(2), 121 Stat. 1844. Congress's recent appropriation of $46 billion to CBP to use in part for the "[c]onstruction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers" reflects and bolsters the explicit power given to federal agencies to construct the border wall. *See* Mem. Op. at 2–3, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026) (citing One Big Beautiful Bill Act, Pub. L. No. 119-21, tit. IX, sec. 90001, 139 Stat. 72,358 (2025)).

In its District of D.C. action, the Nation's *ultra vires* claim alleged that the federal officials "directing the construction" of the border wall had divested the Nation's land without Congressional authorization. *Id.*, Dkt. ¶ 1, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. June 16, 2026). The District of D.C. rejected that argument; the Nation's contention "that the proposed border wall will unlawfully diminish the Nation's reservation boundaries without the authority of Congress and in violation of 25 U.S.C. 398d . . . suffers . . . from multiple deficiencies." *Id.*, Mem.

Op. at 11 (D.D.C. Aug. 14, 2026).

First, the Roosevelt Reservation likely exists along the international border such that the federal government is acting within its right to direct construction of a border wall there. *Id.* The District of D.C. specifically rejected the argument that the Nation is making here in this case; it held that "historical evidence casts doubt" on the argument that the Nation's lands were not "public lands" at the time of establishment of the Roosevelt Reservation, such that the Roosevelt Reservation did not affix to the lands along the Nation's southern boundary. *Id.*; *accord* Dkt. 8 at 15-19. The District of D.C. is correct. In 1907, ten years *prior* to creation of the Nation's Reservation, President Roosevelt established the Roosevelt Reservation. *See supra* Section II.1(a). In 1934, in response to a dispute in which the Nation claimed that its lands were not public lands at the time the Roosevelt Reservation was established, the Solicitor of the Interior issued an opinion concluding that "the interest of the [Nation] in the land they claim [is] subordinate to a superior proprietorship in the United States" and that the Nation did not "have a perfected title in fee which precludes the United States from exercising any proprietorship over the land." Dkt. 18-7, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. July 7, 2026) (Solicitor's Mem. Op. M-27656 (Mar. 1, 1934) at 360, 363, supplemented by M-27656 (Supp.) (May 7, 1934)). The opinion states that the Nation's right of surface occupancy was not an "independent title which can . . . embarrass any future action that to Congress may seem appropriate in the premises." *Id.* at 438, 370–71. Congress later acknowledged the existence of the Roosevelt Reservation in 1937 when it modified the Nation's Reservation boundaries, and the Nation itself acknowledged the Roosevelt Reservation in 2004 when it acknowledged that U.S. Border Patrol "plans to construct the border vehicle barrier and road entirely within the sixty-foot strip of land reserved by the Presidential Proclamation of President Theodore Roosevelt dated May 27, 1907." *See supra* Section II.1(a). In repeating its arguments that the contract between CBP and SLS to construct a border wall

within the Roosevelt Reservation is unlawful, Dkt. No. 8 at 15–19, 21, the Nation ignores the historical evidence supporting the existence of the Roosevelt Reservation, *see supra* Section II.1(a), and the D.C. District Court's comprehensive consideration of that evidence, Mem. Op. at 11–13, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026).

Second, the District of D.C. held that even if the Roosevelt Reservation does not exist on the Reservation, construction of the border wall will not change the boundaries of the Reservation, so Congress's exclusive authority to override Reservation boundaries is not implicated. *Id.* at 13. The District of D.C. made that determination based on the absence "of any case holding that construction of a border wall adjacent to a Reservation—with the possibility activities that may interfere with the Nation's use and occupancy rights—necessarily diminishes the Reservation's boundaries." *Id.* The Nation abandoned its argument that construction of the border wall will change the boundaries of the Reservation for its filing in this Court, and it makes no showing that the Secretary or CBP's actions in directing construction of a wall along the Nation's southern border has the effect of altering Reservation boundaries in violation of the federal agencies' constitutional authority.

Because the federal government has acted within its authority authorizing the construction of a border wall, SLS satisfies the first inquiry in the derivative sovereign immunity analysis.

ii. <u>The federal government has authorized SLS's conduct.</u>

There is no serious dispute that the federal government has authorized SLS's conduct. SLS is not a rogue actor "whose challenged conduct is not dictated by its contract with the government, but is rather within the contractor's discretion." *Nwauzor*, 127 F.4th at 770. Quite the contrary, the Nation acknowledges that for its work within the Roosevelt Reservation and conduct necessary to effectuate that work, SLS is acting pursuant to a contract issued by the government and at the direction of the government. Dkt. No. 1 ¶¶ 26–27; Dkt. No. 8 at 9. Instead, the

Nation asserts that pursuant to the contract between SLS and the government, the Nation has the unilateral authority to reject any and all of SLS's conduct, such that even work approved and directed by the government would exceed the scope of the contract. That cannot be the case.

The relevant inquiry for determining whether derivative sovereign immunity exists is whether "the ***government*** has specifically authorized the contractor's actions at issue." *Nwauzor*, 127 F.4th at 770 (emphasis added). The Nation does not allege that any of SLS's conduct is against the explicit authorization of the federal government; it alleges only that SLS's conduct is against the authorization of the *Nation*. Dkt. 8 at 21. The Nation's own allegations demonstrate that the federal government has directed and supervised SLS's conduct. For example, the Nation alleges that after Nation law enforcement turned away SLS from the Reservation, SLS returned "accompanied by an ***escort of federal law enforcement personnel***." *Id.* at 10 (emphasis added). The Nation also alleges that the Nation "reached ***an agreement with DHS*** not to disrupt the contractors' performance of certain discrete pre-construction activities" and that "SLS has accordingly continued with limited pre-construction efforts." *Id.* (emphasis added). The federal government clearly directs and supervises the challenged conduct. To the extent the Nation alleges that certain conduct on the part of SLS *may* occur outside of the Roosevelt Reservation in temporary staging areas, any speculative allegation of resulting irreparable harm does nothing to remove the implicit federal authorization under which SLS performs its work. When a project is explicitly authorized by the federal government, any ancillary or preliminary conduct that is necessary to execute that project is likewise authorized. *See Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–21 (1940) ("[I]t is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."); *see also H. Landau & Co. v. U.S.*, 886 F.2d 322, 324 (Fed. Cir. 1989), *as amended*

*on reh'g* (Dec. 11, 1989) ("Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.").

The Nation hinges its argument on the contention that any conduct disapproved of by the Nation automatically places SLS in violation of SLS's contract with the government. Dkt. 8 at 21. The single provision that contractors must obtain "all permits and approvals (local, state, Tohono O[']odham Indian Nation and federal) required for construction," *id.*, does not reach so far. First, that clause is applicable only to approvals "required for construction," whereas the Nation has alleged only limited pre-construction efforts on the part of SLS. *Id.* at 10. The next clause in the contract, which the Nation does not cite, states that "[l]and use permits for the design and construction of the project alignments and access roads . . . ***will be acquired by CBP***," thus mooting the *ultra vires* concept the Nation supposes. Dkt. 39-2 ¶ 7.2, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. July 30, 2026) (emphasis added). But more fundamentally, the contract does not vest the Nation with unilateral authority to issue a blanket rejection of any and all conduct performed pursuant to the contract. Such authority would directly conflict with the purpose of the contract and the Congressional directive to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border." Omnibus Consolidated Appropriations Act § 102(a). The requirement for SLS to obtain local, state, and tribal permits necessarily assumes that such permitting requirements will not conflict with this Congressional directive. Any other interpretation would allow local jurisdictions to thwart federal policy by imposing permit-based restrictions. *See, e.g.*, *Leslie Miller, Inc. v. Ark.*, 352 U.S. 187, 190 (1956) ("Subjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed

federal policy of selecting the lowest responsible bidder.”). And whatever the Nation’s permitting authority might be, the Nation makes no allegation that SLS violated any established permitting process. The Nation cannot claim that SLS has exceeded the scope of the contract by not obtaining necessary permits while failing to allege the existence and scope of the permitting process that SLS ostensibly flouted.

Because SLS has acted under the direction and supervision of the government pursuant to a contract the government issued to SLS, the government has authorized SLS’s conduct and a derivative sovereign immunity defense is available to SLS.

b. The federal government is a necessary and indispensable party that cannot be joined.

The Nation’s claim against SLS is also not likely to succeed because the federal government is a necessary and indispensable party in this action that cannot be joined. Courts follow a three-step inquiry with respect to the joinder of parties under Federal Rule of Civil Procedure 19: 1) “Is the absent party necessary (i.e., required to be joined if feasible) under Rule 19(a)?”; 2) “If so, is it feasible to order that the absent party be joined?”; and 3) “If joinder is not feasible, can the case proceed without the absent party, or is the absent party indispensable such that the action must be dismissed?” *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012).

i. The federal government is a necessary party.

First, the federal government is a necessary party in this action. A party is considered “necessary” if “in his absence, the court cannot accord complete relief among existing parties,” “he has an interest in the action and resolving the action in his absence may as a practical matter impair or impede his ability to protect that interest,” or “he has an interest in the action and resolving the action in his absence may leave an existing party subject to inconsistent obligations because of that interest.” *Id.* All three factors apply here.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
HOUSTON

The Court cannot accord complete relief to the parties without the participation of the federal government. "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004). The conduct that the Nation challenges in this action is performed at the direction and supervision of the federal government pursuant to a contract issued by the government to SLS. The relief the Nation requests is an injunction preventing SLS from performing under the contract. *See* Dkt. No. 8. Such relief does not constrain the federal government, which would remain free to issue the same contract to another contractor under its broad authority to secure the border, directing the same conduct challenged in this action, resulting in a new lawsuit by the Nation under the same cause of action.

The government also has an interest in this action such that any resolution without the participation of the government would impede its ability to protect its interest. The Nation challenges SLS's performance under a government contract, and the government has an interest in protecting its ability to enforce the terms of its contract with SLS. *See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) ("[A] party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract."). Here, an award of the Nation's requested injunctive relief against SLS would effectively "decimate" the contract between SLS and the federal government.

Continuing this action without the participation of the federal government also would subject SLS to inconsistent obligations under the contract. Any injunctive relief against SLS would not be binding on the government. Therefore, the government could still seek to enforce its contract with SLS, although SLS would be enjoined from performing under the contract.

ii. <u>It is not feasible to join the federal government.</u>

The second inquiry is whether joinder of the federal government in this action

is feasible. It is not. Claims against the federal government are barred by sovereign immunity. *See Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of L.A.*, 637 F.3d 993, 998 (9th Cir. 2011) ("Because the United States has sovereign immunity, no one, including Indian tribes, may sue the United States without first obtaining permission from Congress."). As the District of D.C. already has determined, the Nation "does not argue that any statute waives sovereign immunity" for the federal government because "[i]t couldn't." Mem. Op. at 14, *Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. Aug. 14, 2026).

In the District of D.C. action, the Nation relied on the *Larson-Dugan* exception to sovereign immunity which states that "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Id.* at 15 (citing *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996)) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690–91 (1949)). The Nation argued that the *Larson-Dugan* exception applies to suits seeking an injunction against officers who abridge common law duties without statutory authorization. *Id.* The District of D.C. rejected that argument, determining that "no court has extended the *Larson-Dugan* exception to common law tort claims, let alone trespass claims, seeking injunctive relief against the Government."[2] *Id.* The same reasoning applies here.

iii. <u>The case may not proceed without the federal government.</u>

Because joinder is not feasible, the final inquiry is whether the case can nonetheless proceed or whether the federal government is an indispensable party, which involves consideration of four factors: "(1) the plaintiff's interest in having a forum; (2) the defendant's interest in not proceeding without the required party; (3) the interest of the non-party by examining 'the extent to which the judgment may as a practical matter impair or impede [its] ability to protect [its] interest in the

---

[2] The D.C. Circuit will hear argument on the Nation's challenge to this ruling on December 1, 2026.

matter'; and (4) the interests of the courts and the public in 'complete, consistent, and efficient settlement of controversies.'" *Paiute-Shoshone Indians*, 637 F.3d at 1000.

All of these factors weigh in favor of the federal government being recognized as an indispensable party. First, the Nation has already had an opportunity to bring its claims against the federal government in another forum—and it did. *See Tohono O'Odham Nation*, No. 26-cv-2127 (D.D.C. June 16, 2026). Second, without the participation of the government, SLS risks being subject to inconsistent obligations related to the enforcement of the contract. Third, the government likewise has an interest in protecting its ability to enforce the contract and avoid a judgment that would effectively "decimate" the contract. *Dawavendewa*, 276 F.3d at 1157. Finally, "the courts and the public have an interest in the *complete* and *efficient* settlement of controversies." *Paiute-Shoshone Indians*, 637 F.3d at 1001. This Court's ruling on the Nation's requested relief as to SLS does not prevent the government from issuing the same contract to a different contractor, leading to more litigation.

While the Nation may have brought this case against SLS, the conduct that the Nation is actually challenging is conduct at the direction and supervision of the government. Therefore, the government is an indispensable party. Because the government is a necessary and indispensable party in this action that cannot be joined, the Nation is unlikely to succeed on its claim against SLS.

## V. <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the Nation's Motion for Preliminary Injunction.

Dated: November 23, 2026

Respectfully Submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*<u>/s/ Catherine N. Hounfodji</u>*
Catherine North Hounfodji 027389
catherine.hounfodji@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Phone: 713.890.5000

Jason R. Scherr (*pro hac vice*)
Bryan M. Killian (*pro hac vice*)
jr.scherr@morganlewis.com
bryan.killian@morganlewis.com
1111 Pennsylvania Ave NW
Washington, D.C. 20004
Phone: 202.309.6000

*Counsel for Defendant SLS Federal Services LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2026, a copy of the foregoing Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Catherine N. Hounfodji*
Catherine N. Hounfodji